# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————————

**No. ACM 40618**

————————————————

**UNITED STATES**
*Appellee*

**v.**

**Liam M. SHIRLEY**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

————————————————

Appeal from the United States Air Force Trial Judiciary

Decided 19 May 2025

————————————————

*Military Judge*: Matthew P. Stoffel.

*Sentence*: Sentence adjudged 9 January 2024 by GCM convened at Fairchild Air Force Base, Washington. Sentence entered by military judge on 27 March 2024: Dishonorable discharge, confinement for 60 months, and reduction to E-1.

*For Appellant*: Major Matthew L. Blyth, USAF.

*For Appellee*: Lieutenant Colonel Jenny A. Liabenow, USAF; Captain Morgan L. Brewington, USAF; Mary Ellen Payne, Esquire.

Before RICHARDSON, MASON, and KEARLEY, *Appellate Military Judges*.

Judge KEARLEY delivered the opinion of the court, in which Senior Judge RICHARDSON and Judge MASON joined.

————————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————————

KEARLEY, Judge:

A military judge sitting as a general court-martial found Appellant guilty, in accordance with his pleas, of three specifications of domestic violence, in

violation of Article 128b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 928b.[1] The military judge sentenced Appellant to a dishonorable discharge, confinement for 60 months, and reduction to the grade of E-1. The convening authority took no action on the findings, but suspended the reduction in rank for six months, to maximize the benefit to Appellant's dependents, with the suspended reduction in rank to be remitted at six months unless sooner vacated.

Appellant raises two issues on appeal: (1) whether Appellant's sentence is inappropriately severe; and (2) whether, as applied to Appellant, 18 U.S.C. § 922 is unconstitutional. We have carefully considered issue (2) and conclude it warrants neither discussion nor relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

We find no error that materially prejudiced Appellant's rights, and we affirm the findings and sentence.

## I. BACKGROUND

Appellant entered the Air Force in 2017. He and his spouse, MS, had their first child, a son named OS, about five years later. Upon his birth, OS experienced respiratory issues which required continuous positive airway pressure treatment for three days in the neonatal intensive care unit.

When it was time to bring OS home from the hospital, Appellant and MS brought OS to the house they lived in together on base. MS would normally care for OS while Appellant was at work. When Appellant came home from work, MS would usually leave the house for a few hours to go to the gym or do other errands, leaving Appellant home alone with OS. Appellant became "panicked" and "frustrated" when OS became fussy when he was home alone with him. Appellant took out his frustration by squeezing OS until he stopped crying and, at times, stopped breathing. Appellant would use two different techniques to squeeze OS: he would either squeeze OS against his chest until he heard the air leave his lungs, or he would cradle OS in his arms and squeeze him into his chest with his left arm until he heard the air leaving OS's lungs. As Appellant squeezed OS, he would muffle his cries and eventually silence him completely to the point of unconsciousness. Appellant could tell from OS's body language that he was causing OS discomfort even though his crying would eventually stop and he would appear asleep. Appellant knew what he was doing was wrong, but he did not tell anyone or get help.

---

[1] Unless otherwise noted, all references to the UCMJ are to the *Manual for Courts-Martial*, United States (2019 ed.).

Appellant admitted that he squeezed OS on approximately 50 occasions. On most occasions, Appellant was the only parent in the home, but on a handful of occasions he would do this when his wife was asleep. On each occasion, Appellant would squeeze OS for 5–10 seconds. The squeezing caused numerous fractures to the bones in OS's torso. On approximately seven occasions, Appellant squeezed OS until OS became unconscious due to lack of oxygen. On these occasions, Appellant would perform cardiopulmonary resuscitation (CPR) to resuscitate OS by putting his hands on OS's chest and performing compressions until he began breathing.

During one of the last squeezing incidents, Appellant heard OS's collarbone pop. The pop was the sound of Appellant fracturing OS's clavicle. OS also suffered from fractured ribs due to the squeezing. Additionally, due to the deprivation of oxygen resulting from the squeezing, OS developed bilateral subconjunctival hemorrhages, which are bleeding in the eye. The hemorrhages would go away after a few days and come back after the next incident. On at least one occasion, OS experienced protracted and obvious disfigurement to his eye.

In addition to the squeezing, Appellant would yank OS's legs straight to the point of fracturing his bones. Appellant would get frustrated when OS would move his legs while Appellant was trying to change his diaper. On approximately 10–15 occasions, Appellant would grab both of OS's legs and in one jerking movement with tremendous force, yank them straight. Appellant did this by pulling OS's legs together with one hand while simultaneously pushing down with an extreme amount of force on OS's upper pelvic area to keep his body on the changing table but his legs straight. On multiple occasions, Appellant yanked OS's legs with enough force to fracture OS's left and right femurs and cause OS to cry out in pain.

MS was not aware of the extent of OS's injuries. However, on more than one occasion, MS noticed OS seemed to be in pain or had blood in his eyes. She took him to the doctor, once for the subjunctive hemorrhage in his eyes and another time for fussiness and not moving his legs. The medical providers did not suspect abuse, and OS was discharged back to his home each time.

However, the abuse came to light after the "popping" incident. MS noticed that OS was acting abnormally. He was sensitive when he was touched in certain areas on his body, and he retracted his legs when they were touched. MS noticed swelling around OS's clavicle and decided to take him to the emergency room. An x-ray showed that OS suffered from a fracture of the mid right clavicle and part of the bone splintered away from the rest of the bone. After noticing these injuries, the doctor ordered a "child abuse and neglect consult" with another doctor. OS received a full skeletal survey and an ophthalmology consult.

The doctors noted that OS had an acute clavicle fracture with bruises on the back. As OS was only three months old and non-mobile, the doctors noted that he could not have placed himself in a circumstance leading to this injury. When asked about the potential cause of the injury, Appellant said that he sometimes tossed OS in the air, and there was one time that he had to catch OS right before OS hit the ground. Based on their training and experience, the medical providers determined that Appellant's explanation was false.

The skeletal survey revealed that OS had two healed rib fractures and six healing subconjunctival hemorrhages. The survey showed OS had multiple fractures of the femurs and a fracture of the left tibia, also in different stages of healing. Suspecting abuse, the medical professionals made notifications, which led to investigative agencies becoming involved. Air Force Office of Special Investigations (OSI) interviewed Appellant. After voluntarily waiving his Article 31, UCMJ, 10 U.S.C. § 831, rights, Appellant shared the same story that he gave the medical providers. He claimed that OS's injuries were the result of Appellant almost dropping OS and throwing him in the air in a "jovial and playful manner."

After OSI pointed out the flaws in Appellant's explanation, Appellant admitted that he caused OS's injuries. He told investigators how he would squeeze OS to the point of unconsciousness. He demonstrated how he did this by forcefully squeezing a lifelike baby doll that the investigators provided him. He also admitted that the fractures on OS's legs were likely caused by the way he would forcefully "yank" on OS's legs to keep him from moving them while changing his diaper. Appellant used the same doll to demonstrate how he yanked OS's legs. Appellant's demonstrations with the doll were recorded on video and admitted into evidence during sentencing. The video shows Appellant speaking in a matter-of-fact fashion while demonstrating his actions with the baby doll using significant force.

Appellant told OSI that he knew what he was doing was wrong and that his actions could and did hurt OS. Appellant claimed he never abused OS when MS was around because he would be ashamed if she found out. OS was removed from Appellant's care and, as of the time of Appellant's court-martial, OS lived with MS and her parents. Appellant retained his parental rights and was able to have supervised visits with OS up until the time of his court-martial. Appellant was charged with attempted murder and domestic violence.

Before his court-martial, Appellant submitted an offer to plead guilty to the charge and its three specifications of domestic violence, conditioned on the Government's dismissal of the attempted murder charge. As part of this offer, Appellant agreed to be sentenced to a period of 60 months of confinement for each of the three specifications of the charge to which he agreed to plead guilty, with all confinement time to be served concurrently, and a dishonorable discharge.

The convening authority accepted Appellant's offer and dismissed the specification and charge for attempted murder.

At trial, Appellant pleaded guilty to three specifications of domestic violence in violation of Article 128b, UCMJ. In accordance with Appellant's plea agreement, the military judge sentenced Appellant to a dishonorable discharge and 60 months' confinement for each specification to run concurrently. Additionally, the military judge adjudged a reduction in rank to the paygrade of E-1, and the convening authority suspended it for a period of six months.

During the presentencing phase of his court-martial, Appellant had three witnesses speak on his behalf: MS, MS's mother and MS's father. Their testimony focused on Appellant's behavior since the offenses were discovered. During the year between Appellant's offenses being discovered up until the day of his court-martial, Appellant participated in over 600 hours of supervised visitation with OS. Many of those later visits included MS's parents serving as the supervisors, so they had many opportunities to witness Appellant interact with his son. MS and her parents testified about the growth they witnessed from Appellant during these supervised visits. They saw impressive growth and felt that OS adored Appellant. MS and her parents testified that OS was a happy and healthy 18-month-old child at the time of the court-martial and that his injuries had fully healed.

As part of the Government's case in aggravation, Dr. AH, a child abuse pediatrician, provided the following to the court about potential impact to OS:[2]

> In addition to the injuries identified, there is a potential for long-term complication related to the actions described in the forensic interview that may become apparent with time. It was described that there were multiple episodes of OS losing consciousness as a result of squeezing his chest. Loss of consciousness in these episodes is most likely the result of disordered blood circulation involving the brain leading to oxygen deprivation and accumulation of cellular waste products. The brain and its cells are highly sensitive to such deprivation and cellular injury may reasonably have occurred. This may manifest in time as developmental delay, behavioral difficulties, and learning disorders.
>
> It should also be noted that the actions described had the potential to result in catastrophic injury to other vital organs of the body and even death.

---

[2] Dr. AH's review was attached to the stipulation of fact between Appellant and the Government.

Appellant provided an unsworn statement. He expressed remorse and apologized to his son, his wife, and her family. He explained that he was burnt out with the stressors of being a parent for the first time.

## II. DISCUSSION

### A. Sentence Appropriateness

Appellant was sentenced to a dishonorable discharge, confinement for 60 months, and reduction in grade to E-1. Appellant requests that we approve a sentence of no more than three years' confinement. We find Appellant's sentence is not inappropriately severe and do not grant relief.

#### 1. Law

We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (footnote omitted). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (per curiam). Although we have great discretion to determine whether a sentence is appropriate, we have no power to grant mercy. *See United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010) (citation omitted).

#### 2. Analysis

We are not persuaded Appellant's sentence, to include 60 months' confinement, is inappropriately severe.

We have considered this particular Appellant. We acknowledge Appellant showed growth as a parent and strong commitment to building a relationship with OS after the offenses. His commitment to spending time with OS showed promise of rehabilitation. We considered that even MS's parents, who were deeply affected by Appellant's abuse of their grandson, took the time to acknowledge his growth and testify on his behalf at sentencing. Appellant also provided the court with photos and a video of OS and him playing together during their supervised visitation. In these photos OS is an older baby, nearly 18 months, and able to play and interact with Appellant. The photos indicate that OS has bonded with Appellant and enjoys having Appellant play with him and read to him. The testimony of MS and her parents, combined with the photos of Appellant lovingly interacting with OS, should encourage Appellant that he can develop into a father that has a good, safe relationship with his son. However, Appellant's growth does not mitigate his violent abuse of OS such that his sentence should be reduced.

The nature and seriousness of Appellant's crimes support the sentence imposed. Appellant crushed his infant son with enough force to prevent him from

breathing. When OS lost consciousness, Appellant resuscitated him with CPR to keep him alive. Appellant's force was enough to cause OS's eyes to turn red with hemorrhages. Despite knowing the lethality of his force, Appellant continued to squeeze and crush his infant son on a near daily basis for the next three months. He had to conduct CPR to recover his son on at least six occasions to save him from the asphyxiation that Appellant himself inflicted upon him. Appellant's mistreatment of his son was so extreme that it was unconscionable. The violence only ended when he broke OS's collarbone, causing it to splinter away from the rest of the bone in a revealing manner, which led to OS's emergency room visit and full discovery of Appellant's abuse.

Appellant caused 15 bone fractures to OS, including fractures to his ribs, both femurs, left tibia, and clavicle. OS had multiple bruises and swellings and hemorrhages in his eyes. When Appellant was given a baby doll to demonstrate how he would yank OS's legs straight while trying to change his diaper, he did it with a shocking amount of force. Given the amount of force Appellant demonstrated to OSI, it is not surprising that Appellant broke his infant son's legs. However, he did not just do this one time. OS's full medical examination showed evidence of fractures in his femurs at various levels of healing. As OS would heal, Appellant would break his son's bones again. Appellant's relentless, repetitive violence against OS, a three-month-old baby, clearly supports a sentence of 60 months' confinement.

Although he recognizes the injury he caused, Appellant claims "[t]he lack of victim impact sets this case apart" and that his actions "left no lasting impact on OS." Several witnesses to include MS, testified that OS does not have any permanent damage. By contrast, Dr. AH, a pediatric abuse expert, indicated that "there is a potential for long-term complication related to the actions described in the forensic interview that may become apparent with time." He also explained that given that the brain and brain cells are highly sensitive to oxygen deprivation, "cellular injury may reasonably have occurred." He indicated this could manifest in time as "developmental delay, behavioral difficulties, and learning disorders." While it is fortunate that OS seemed to recover well, we do not place significant value on Appellant's argument that there is somehow a lack of victim impact. Furthermore, only time will tell if there is a lasting impact on OS.

We note Appellant took responsibility for his crimes by pleading guilty to the offenses for which he was convicted rather than contesting them at trial after the Government agreed to withdraw and dismiss an attempted murder charge. Appellant's willingness to take responsibility through his guilty plea weighs slightly in Appellant's favor, but it does not tip the scales in favor of sentence relief.

We have carefully considered Appellant's personal history and characteristics, the nature and seriousness of his offenses, his record of service, and all other matters contained in the record of trial. *See Anderson*, 67 M.J. at 705. We conclude Appellant's sentence is not inappropriately severe.

### III. CONCLUSION

As entered, the findings are correct in law, Article 66(d), UCMJ, 10 U.S.C. § 866(d) (*Manual for Courts-Martial, United States* (2024 ed.)). In addition, the sentence, as entered, is correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court